STATE OF MAINE                          SUPERIOR COURT
HANCOCK, SS.                            CIVIL ACTION
                                        Docket No. CV-01-32
                                        _ _ _ _ _ _ _ _ _ _ _ _

Bond Builders, Inc.,
        Plaintiff/Counterclaim Defendant


v.                                      Decision and Judgment


Gerard R. LaChance,                     DONALD L. GARBRECHT
        Defendant/Counterclaim Plaintiff        LAW LIBRARY

                                        MAY 25 2004


        A jury-waived trial on the complaint and counterclaim was held on August 19,

October 2 and October 6, 2003. On each hearing date, a representative of the plaintiff,

the defendant and both counsel of record were present. Following the hearing, the parties

filed written argument that the court has considered.

        In this action, the plaintiff, a general contractor and construction firm, seeks

recovery for amounts that it claims to have loaned to the defendant during the time the

defendant worked for the plaintiff as a project manager. It also seeks judgment for rent

covering several months while the defendant lived a residence owned by the plaintiff

following his separation from employment.[1] In a counterclaim, the defendant seeks

judgment for a portion an amount that he claims he saved for the plaintiff's benefit in the

course of a major construction project.

_____

[1] After the defendant filed his counterclaim, the plaintiff amended its complaint with a
claim (incorrectly described as a counterclaim) alleging that the defendant was liable to
the plaintiff for cost overruns on the Maniatis construction project. At the close of the
plaintiff's case in chief, the court granted judgment as a matter of law on that count, see
M.R.Civ.P. 50(d), because, among other things, the plaintiff had not presented sufficient
evidence that the defendant should be individually liable for that loss sustained by his
employer and because it had presented no evidence of a standard of care against which
the defendant's conduct could be assessed.

1

## I. Plaintiff's complaint
### A. Loan or bonus?

The defendant was employed by the plaintiff between August 1996 and August 2000, when he resigned. Throughout much of that time, the plaintiff advanced moneys to the defendants for various personal expenses and obligations. In August 1998, the amount the defendant had received from the plaintiff, less the amounts he had repaid the plaintiff, was nearly $31,000. At that time, the defendant borrowed $30,000 from Bar Harbor Banking and Trust (BHBT) and tendered $25,000 of the loan proceeds to the plaintiff in order to reduce the balance of borrowed moneys to nearly $6,000. The plaintiff continued to provide money to the defendant beyond the amount he was entitled to receive as his salary. By the time he left his job in 2000, the balance had grown to an amount in excess of $38,000. Further, the defendant made occasional payments to BHBT pursuant to the loan agreement, but the plaintiff, which signed the note as a gu`Ëantor, made most of the payments and continued to do so after the defendant left his employment in August 2000. The plaintiff claims here that the money that it provided directly to the defendant represented loans and that he is liable for the unreimbursed amounts that he received directly from the plaintiff. It also alleges that the defendant is liable for amounts it paid to BHBT pursuant to the note executed by the defendant and for the outstanding balance on that note. The sum of these claims is roughly $60,000. The defendant contends that any amounts paid to him or on his behalf were bonuses or other forms of compensation. The concludes that the preponderance of the evidence establishes that the payments at issue here were not part of the defendant's compensation and that he is liable to the plaintiff for the amount of those payments.

The terms and conditions of the defendant's employment with the plaintiff were memorialized in writing. *See* defendant's exhibit 2. The defendant's salary was later changed, again in writing. *See* plaintiff's exhibit 17. The amount of his financial compensation is specified in those documents, and there is no reference to any bonus system or expectation. The defendant testified that when he was hired, Robert Bond, who at the time was the company's president and CEO, told him that he would also receive the "perks of the trade." Even if this were the case, for at least two reasons, it would not demonstrate an entitlement to bonuses. First, the defendant in fact received

2

other benefits in kind, which were therefore qualitatively different from the financial compensation that was set out in the engagement letter. Those benefits included the use of a company vehicle and a company credit card for gas and other vehicle-related expenses. Thus, the "perks" that Bond may have mentioned did not necessarily mean cash bonuses. Second, the defendant testified that in his prior positions in the construction industry, he received significant bonuses and therefore believed that they were a standard component of compensation (that is, a "perk of the trade"). He further testified that in other jobs, he was paid more than $83,000 annually in salary and as much as $30,000 in bonus money. However, he subsequently testified that he was not sure whether or not the first figure included bonuses. From this ambiguity, particularly when seen against the general background that the evidence places the defendant's credibility in a poor light, there is a real question about whether in fact the defendant had received bonuses – either any bonuses or, at least, bonuses of the magnitude at issue here. This weakens his argument that there was a meeting of the minds about his entitlement to bonuses.

The documentary evidence in this case provides strong, affirmative evidence that the advances made by the plaintiff were loans, rather than bonuses or other compensation that did not commit the defendant to repayment obligations. This documentary evidence takes four forms. First, the plaintiff maintained detailed records of the amounts it provided to the defendant beyond his compensation, and it characterized them as "ARE," an acronym for "accounts receivable employee." *See* plaintiff's exhibits 1-2, 4-5, 10. Occasionally, money was withheld from the defendant's paycheck, and those withholdings were credited against his ARE balance. The defendant professed to have no knowledge about the ARE system and claims that no one advised him of this process or discussed it with him. This testimony is not credible. The ARE withholding from the defendant's gross income resulted, of course, in a reduction of his net pay for that particular pay period. At times, the ARE withholding would be as much as $600, leaving the defendant with net weekly income of less than $20. *See* plaintiff's exhibit 10. Particularly when the defendant testified that his take-home pay was inadequate to meet his expenses, it is not reasonable to expect that he would remain silent when his paycheck was in a lesser amount than normal. Clearly, the defendant was aware of the arrangement

3

under which he was to repay – and did repay -- the plaintiff, and he raised no issue about it.

Second, three times during the period of his employment with the plaintiff, the defendant signed promissory notes in favor of the plaintiff for amounts beyond his ordinary salary that the defendant had provided to him. *See* defendant's exhibits 10, 11 and 13 (also included as part of plaintiff's exhibit 1). This is clear evidence that the payments underlying these notes were not gifts or compensation to the defendant. The court rejects the defendant's testimony that the plaintiff wanted him to execute the notes for collateral purposes.

Third, when the cumulative payments made to the defendant became substantial, the plaintiff insisted that the defendant make some arrangement to reduce that balance by obtaining a bank loan and using the proceeds to pay off at least some of that accumulated debt. The plaintiff assisted the defendant in securing that financing through BHBT. As is noted above, most of the loan proceeds were turned over to the plaintiff, which the plaintiff then applied to the defendant's ARE account. *See* plaintiff's exhibit 1. This still left a balance due of nearly $6,000, which then continued to grow through the remainder of the defendant's employment with the plaintiff. *See* plaintiff's exhibits 2 and 3. The very fact that the defendant signed a note with the bank, borrowed money generated by that note and then paid most of the loan proceeds to the plaintiff all combine to demonstrate the parties' clear and mutual understanding that the defendant was liable to the plaintiff for the extra-salary payments. If this financing were some cosmetic arrangement for the plaintiff's advantage, then the involvement of the bank would have been unnecessary because the plaintiff simply could have continued to provide the defendant with extra money in the guise of a loan and then written off those amounts.

The defendant testified that when the plaintiff requested him to obtain third party financing, he responded that his financial circumstances would not allow him to make the payments that the note required. According to the defendant, Robert Bond told him to merely make the payments that he could and that the plaintiff would take care of the rest. From this, the defendant argues that there was no expectation that he would make the payments but rather that the plaintiff, as guarantor, would do so. This argument fails because the arrangement attributed to Bond would mean that, in effect, the plaintiff

4

would give the defendant a blank check: the defendant would pay some amount, but the plaintiff would then be responsible for any amount – whatever the amount might be – that remained unpaid of the defendant's own initiative. The court finds this arrangement unlikely. The defendant's account is also inconsistent with his contention that he was not required to make any payments to the bank because of the bonus arrangement he alleges here. In fact, the defendant did make some payments required by the promissory note, thus undermining his contention that he bore no responsibility for the debt to the bank or the debt to which part of that bank loan was applied.

Fourth, in addition to the arrangements that the defendant actually made to repay the plaintiff (that is, the payroll withholdings arising from the ARE account and the bank loan), the defendant had discussions with Frank Reid, then the business' vice president and office manager, about other ways he (the defendant) expected to raise money, which could be used to reduce his liability to the plaintiff. These included the prospects for settling a legal claim that would generate cash, and the sale of a boat. There would be no purpose for these discussions other than in the context of the defendant's acknowledgement to the plaintiff that he owed money to the plaintiff.

The defendant raises other points to support his position that the payments were not loans. Of these, three warrant mention here. First, while the defendant was overseeing a significant construction project for the plaintiff, he was arrested on a warrant that arose from an unpaid child support obligation in Massachusetts. The plaintiff itself furnished in excess of $17,000 to secure the defendant's release on bail. This is included in the amount that the plaintiff claims as a loan. *See* plaintiff's exhibit 1 at pp. B and R. According to the defendant, Robert Bond told him that he (the defendant) had no obligation to reimburse the plaintiff, because the plaintiff was willing to pay that amount to get the defendant back to the jobsite. However, there are two flaws to this contention. First, for the defendant to be able to return to work, the plaintiff did not have to give this money to the defendant (or to let it be used to extinguish the defendant's child support obligation); rather, the plaintiff had achieved its goal simply by securing the defendant's release from custody. Second, the payment of the $17,806 was fortuitous and unrelated to the defendant's compensation. In other words, there is no evidence that the defendant would have received some extra amount of compensation if he had not been arrested on

5

the Massachusetts warrant. Thus, it does not make sense that simply because he was arrested, he receives the benefit of an extra $17,806 payment.

Second, during the final five or six months of his employment with the plaintiff, he in fact was paid $1,000 more per month than he had received previously. The defendant characterizes this as a bonus in support of his argument that, in fact, he was entitled to bonuses. The regularity and consistency of these payments, however, make it as least as likely that they simply reflected an increase in salary.

Finally, the defendant argues that the extra payments he received from the plaintiff could only have been treated as part of his compensation because he could not afford to live on the amount of pay set out in the plaintiff's engagement letter to him. This argument is undermined by the weight of the evidence, discussed above, demonstrating that these payments were loans, and by the fact that the amount of plaintiff's payments to him would not be driven by the his personal expenses. Beyond this, the amount of the defendant's compensation package was not insignificant, particularly when one considers the value of the use of the firm's vehicle and its assumption of expenses relating to the use of that vehicle.

As of the end of August 2000, when the defendant resigned from employment with the plaintiff, he owed the plaintiff $38,560. *See* plaintiff's exhibit 4. This consists of the amounts that the plaintiff had paid directly to the defendant as well as the payments made to date by the plaintiff to BHBT pursuant to the promissory note that the defendant had executed in the bank's favor. The plaintiff is entitled to recover this amount as part of the judgment.

With respect to the bank loan subsequent to August 2000, the plaintiff continued to make payments through the dates of trial in this matter. The parties stipulated that as of August 2003, the amount needed to extinguish the loan was $21,545. That payoff amount would have been less as of the final trial date in October, and further reduced as of now, if the plaintiff has continued to make the loan payments. The amount of that principal reduction as of those dates is not revealed in this record. The court will frame the measure of recovery for this part of the plaintiff's claim based on the expectation that the defendant has abdicated his responsibility to pay the bank loan. He has made no payments apparently since September 1999, nearly a year prior to when he separated

6

from his employment with the plaintiff.[2] This means that the plaintiff will be liable on the bank note and therefore is entitled to recover from the defendant an amount equivalent to its present liability to the bank. The amount of that part of its recovery will be the payout figure rather than the sum of the monthly payments not yet due; were it otherwise, the plaintiff could receive a windfall by paying off the loan early and reducing the total amount of its payments to the bank. The most recent evidence is of the loan payout in August 2003. The court declines to take into account any payments that the plaintiff may have made since that date, because as a matter of mitigation, if nothing else, the plaintiff could have been reduced it total liability to the bank by paying the loan in full. Further, because the payoff amount in October 2003 is not in the record, the court would be required to speculate in order to arrive at a comparable present figure.

Therefore, in addition to the amount owed by the defendant to the plaintiff as of August 2000, he is also liable to the plaintiff for the monthly payments it made on his behalf through August 2003 ($480 per month for 36 months, for a total of $17,280) and the payoff amount as of August 2003. The plaintiff's recovery for this part of its claim is therefore $33,825.33. When combined with the amount due as of August 2000, the plaintiff is entitled to recover $77,385.33.

**B. Rent**

For part of the time when the defendant worked for the plaintiff, he lived in an apartment located in a building that the plaintiff owned. His weekly income was reduced, and he was not charged rent. He also did some work on the building. When his termination date approached, the defendant and Frank Reid engaged in some correspondence about future rental arrangements. *See* defendant's exhibits 24-26. In response to a proposal from the defendant, Reid advised the defendant that the plaintiff would charge him monthly rent of $600 if he continued to live there. The defendant replied that it that were the case, he (the defendant) would then charge the defendant a greater hourly rate for labor he had provided previously. In light of that and also of what he felt was a substantial increase in the value of the premises resulting from his work, he

---

[2] The court makes this inference because the plaintiff has made payments of $480 (charged to the defendant on his ARE) each month since October 1999. Therefore, it may be the case that the defendant made the payment that was due in September 1999 because there is no record that the plaintiff made that payment.

7

felt that he would not owe the plaintiff any rent to continue to live there for the three months that Reid had permitted. The plaintiff never agreed to the defendant's proposal.[3] In fact, the defendant did not vacate the premises until the end of 2000 (after the plaintiff commenced an action for forcible entry and detainer), thus living in the apartment for four months after he left the plaintiff's employment.

The court does not find that there was a meeting of the minds that would absolve the defendant of any liability for rent during those four months. Rather, Reid conveyed an offer to the defendant: the defendant could continue to live in the apartment and would be required to pay $600 for each month of that occupancy. In fact, the defendant accepted by performing, that is, by his decision to continue living in the apartment. The parties did not agree to a different arrangement for rent, and the defendant could not unilaterally change the terms of that implicit agreement. Thus, the liable to the plaintiff for the rent specified by the plaintiff.

## II. Defendant's counterclaim

In his counterclaim, the defendant contends that he is owed $71,500 from the plaintiff. This, he claims, is the amount of savings he was able to achieve as part of the Maniatis construction project, which was a major project in which the plaintiff was to be paid by the homeowner on a fixed price basis.[4] In fact, the Maniatis project resulted in a substantial loss for the plaintiff: the contract price, including change orders, was roughly $2.5 million, and the actual costs of construction were approximately $3.4 million, resulting in a loss to the plaintiff of $900,000. The defendant was the initial project

---

[3] While this is shown by the evidence as a whole, it is established in a salient way by the defendant's written comment, ". . .I must at this time charge you for work I have done . . . ." *See* defendant's exhibit 26. This demonstrates the unilateral nature of the rental arrangement envisioned by the defendant.

[4] A fixed price is a defined contract price for the construction project, subject to any change orders. The alternative is a "cost plus" arrangement, where the homeowner pays the contractor for the contractor's actual costs of labor and materials (including the costs of subcontractors) and an established margin based on those actual costs. In the latter, for the contactor there is a guarantee of margin. In a fixed price project, the contractor is exposed to a loss if the actual costs exceed the fixed price. However, there is also the prospect of a margin that can be significant is the actual costs are held down.

manager on the Maniatis house but was removed mid-course because he and the house's architect did not have a productive working relationship.

Robert Bond testified that he had agreed with the plaintiff that if the Maniatis project had generated a net profit for the plaintiff, the defendant would share some of that gain. Bond denied that he had agreed to allocate any money to the defendant if the project were not profitable. Even the defendant, in his testimony, was unable to state that he would be entitled to profit on a project that lost money for his employer. It is not reasonable to believe that the plaintiff would enter into such an agreement. If the defendant saved $143,000 for the plaintiff as he claimed, then in this situation it ended up as a reduction of the plaintiff's loss rather than as an increase in any net profit (of which there was none).[5] If the plaintiff lost money on the job, it would not want to incur additional losses by paying extra money to the defendant beyond the amount that he would be paid anyway. Thus, the court finds that the parties did not enter into an agreement under which, in the circumstances of the Maniatis project, the defendant would receive additional compensation based on savings he claims to have manufactured.

The parties have differing views on who was responsible for the cost overruns. Resolution of this issue is not necessary to decide the defendant's counterclaim, except to note that the defendant has not shown that the plaintiff was at fault for the circumstances that led to the loss and that it is nonetheless liable to him on that basis.


The entry shall be:

For the foregoing reasons, on the complaint, judgment is entered for the plaintiff in the amount of $79,785.33, plus pre-judgment interest at the annual rate of 9.052%, post-judgment interest at the annual rate of 7.41%, and its costs of court. On the counterclaim, judgment is entered for the counterclaim defendant (the plaintiff).

FILED &
ENTERED

MAR 09 2004

SUPERIOR COURT
HANCOCK COUNTY

Dated: March 6, 2004

_____
Justice, Maine Superior Court

---

[5] He accomplished any such savings by basing his contract proposal on bids submitted by prospective subcontractors and then, after the contract was finalized, reneged on those contractors by trying to find other firms to do the work that was bid, but at a lower price. One would surmise that abandoning the subcontractors who submitted the original bids would not be in the plaintiff's long-term best interests.